ALBERT H. RUTTER, CHARLES H. JONES and JULES SIMAYS *v.*
JAMES E. BURKE ET. AL.

November Term, 1914.

Present: POWERS, C. J., MUNSON, WATSON, HASELTON, and TAYLOR, JJ.

Opinion filed April 9, 1915.

*Municipal Corporation—Discretion of City Council—Removal
of Officers — Grounds—Procedure—Charges—Notice—Ad-
journment—Swearing of :Witnesses—Evidence of Miscon-
duct—Documentary Evidence—Evidence Taken by Com-
mittee—Appointments for Definite Term—Nature and
Functions of City Council—Functions of Mayor—Dual
Capacity—Mayor's Right to Vote—Judicial Review of Re-
moval of City Officers—Discretionary Power—Certiorari—
Office of Writ—What Constitutes Record—Review of Evi-
dence—Quo Warranto.*

A charter provision giving a city council power to remove its appointees
"for such causes of incapacity, negligence, or bad conduct as to it
shall seem sufficient" limits that power of removal to cases where
one of those causes is found to exist.

If there is evidence tending to establish such a cause, the weight of
the evidence and the sufficiency of the cause are for the city
council to determine, and its action will not be reviewed.

There must be something that in law amounts to "incapacity, negli-
gence, or bad conduct" to sustain the removal by the city council
of its appointees, under a charter empowering it to remove for one
of those causes.

Officers appointed for a definite term are removable only for cause,
in the absence of express authority to remove at pleasure.

Where a person in possession of an office is ousted therefrom and his
successor elected or appointed, *certiorari* and not *quo warranto* is
proper to review the proceedings had in ousting him.

A city council is primarily a legislative and administrative body, but
is often charged with judicial, or *quasi* judicial, functions, as when
sitting on charges involving the removal of an appointee for cause.

A city council, in removing an appointee for cause, may be subject to

judicial review only in part, and in part be vested with discretionary power.

Under ordinary charter provisions, the mayor may sometimes be entitled to act in a dual capacity, for although a constituent part of the city council, he is especially charged to enforce ordinances and the performances of duties by subordinate officers.

Since inquiries involving removal from office are of a judicial nature, the person charged· is entitled to notice, opportunity to be heard, and a reasonable time to prepare his defence.

The proceedings of a city council to remove an appointee being summary, and designed to accomplish an administrative purpose, full compliance with rules governing trial in court are not required.

The mayor is not disqualified from participating in the final vote in a proceeding by the city council to remove an appointee from office, and wherein the mayor acts as accuser, prosecutor, and witness, but such management and conduct of the trial might afford the basis of a judicial review.

In proceedings of a city council to remove an appointee from office, the charges need not be so‚ formal and complete as is required in court proceedings, but they must fairly inform him of the accusations on which he is tried.

If an officer is removed by the city council for legal cause and on proceedings sufficiently regular, the mayor's motive in preferring charges against him is immaterial.

Where a charter provision giving a city council power to remove its appointees for incapacity, negligence, or bad conduct is silent as to the mode of procedure, the substantial principles of the common law governing proceedings affecting private rights must be followed; for·though the council in such case is not a court in the strict sense, its duty is so far judicial that it must swear the witnesses produced before it.

Though witnesses should be sworn in a proceeding by a city council to remove water commissioners, pages of items relating to rebates, gathered from the books of the water department, and certified as correctly taken, need not be verified by the oath of the accountant as a witness, where the books themselves are in the· office of the department in the building where the hearing is had, in the custody of the accused, and open to the inspection of all members of the city government.

The writ of *certiorari* brings to this Court for inspection and review the record of some proceeding of an inferior tribunal.

Though the strict "record" does not include the evidence, the evidence, or some statement of it, may be brought up on *certiorari* with the record proper, when needed to establish a reviewable matter, and will then be examined to determine the question involved.

If testimony taken before a committee of a city council can be used in the hearing before the council in a proceeding for removal of its appointees for cause, the accused should have the same notice of the committee's proceeding and the same presentation of charges as are required for a hearing by the council in the first instance; and such testimony must be read to the council on the hearing, unless it has been printed and placed in their hands for reading.

In a proceeding before a city council for the removal of water commissioners for cause, the charge that in 32 cases "favored persons were allowed rebates on their water bills, while other persons paid the regular rate," in violation of a designated section of the city charter, is sufficiently definite.

It was within the discretion of the city council to receive in evidence a statement of such unauthorized rebates taken from the department books by an accountant who certified its correctness, instead of requiring his oath as a witness.

The practice of water commissioners of giving rebates not justified by the city ordinances is legal cause of removal from office.

Where the removal of water commissioners because of giving unauthorized rebates rests in the discretion of the city council, the accused are entitled, on claiming the right, to introduce evidence explaining the practice, as the council might conclude that the interests of the city did not require their removal.

In a proceeding by a city council for the removal of water commissioners for cause, where it does not appear that all the evidence taken by an investigating committee of the council on any one charge was read to the council, a reference made by the mayor to evidence claimed to be recited in the transcript of the proceedings before the investigating committee did not bring that evidence before the council, and his statement of what could be found in that transcript was incompetent.

Where twelve charges of misconduct were made against water commissioners after several hearings by an investigating committee of the city council, of which the accused had no notice except from newspaper accounts, and it was necessary to prepare to answer

all the charges, one day's notice to appear before the council and answer was insufficient, and the accused were entitled to an adjournment to prepare their defence.

The writ of *certiorari* is not a writ of right, and so may be refused in the Court's discretion, but not without heeding all the circumstances and considering what the ends of justice may require.

A petition for a writ of *certiorari* to review the removal of city water commissioners is granted and the removal proceedings ordered to be quashed, though it appears that material improvements in the administration of the department have been made since such removal, where the detriment possible from granting the writ is not such as to bring the case within that class of cases where the writ may be refused where there is error, if the judgment appears right, or great public inconvenience will result.

PETITION for a writ of *certiorari,* brought to the Supreme Court for Chittenden County at its November Term, 1914, and then heard on the pleadings.    The opinion states the case.

*V. A. Bullard* and *Sherman R. Moulton* for the petitioners.

*Max L. Powell* for the defendants.

MUNSON, J.    This is a petition for a writ of *certiorari.*    The petitioners were, at the time of the action complained of, the water commissioners of the city of Burlington.    The petitionees were the mayor and aldermen of the city, constituting the city council.    The regularity of the proceedings of the city council in removing the water commissioners is the matter in issue.

The charter makes the mayor the chief executive officer of the city, and requires him to see that the laws and city ordinances are enforced, and that the duties of all subordinate officers are faithfully performed.    The water commissioners are appointed by the city council to serve for a term of three years and until their successors are qualified.    A superintendent of the city water works is appointed by the water commissioners annually, and may be removed by them at any time for sufficient cause.    The charter provides that "the city council shall have power for such causes of incapacity, negligence or bad conduct as to it shall seem sufficient, to suspend or remove from any office any city officer who may be appointed by the city council, and to

2

fill all vacancies in any such office from whatever cause arising.''

We give, by way of preliminary, an outline of the transactions which have resulted in this petition. On the eighth day of April, 1914, J. F. Kidder, superintendent of the water works, whose term of office was about to expire, discharged Oscar Heininger, who had been in the service of the water department about thirty years, and was a faithful and efficient employee. The only cause for the discharge, assigned at the time or afterwards asserted, was that Heininger was seeking to be appointed superintendent at the expiration of Kidder's term. Kidder charged Heininger with attempting to displace him, and Heininger denied it; and as far as appeared in the subsequent inquiry Heininger had made no effort in this direction, and Kidder had no good reason to believe that he had. Kidder told Heininger that if he would apologize for what he had done he could come back. Heininger did not recede from his statement, and no apology was tendered. A few days after the discharge Mayor Burke tried to have Kidder take back Heininger, and Kidder refused to do it without the apology. On the fourth day of May the board of aldermen adopted a resolution of inquiry regarding this and any other matter affecting the department, and appointed a committee of three aldermen to investigate and report. The resolution was drawn by the mayor. This committee met May fourteenth, and had several hearings between that date and June sixteenth. The mayor presented charges against the water department generally, and some specific charges against Superintendent Kidder and the commissioners individually, and appeared at all the meetings in support of these charges. He had an accountant examining the books of the department while the hearing was in progress, and from time to time added to the charges until they numbered 26. Superintendent Kidder appeared at these meetings and was fully heard by himself and witnesses in opposition to the charges. The commissioners did not appear. It is alleged in the answer of the contesting petitionees that the water commissioners were requested to appear before the committee if they desired to answer the charges. A majority of the committee made a report sustaining many of the charges, and this was taken up by the board of aldermen July first, when a motion that it be accepted and adopted was lost by a tie vote. On the following day the city council, without charges having been preferred or notice given, voted by a

majority of one to remove the water commissioners from office. At a meeting of the city council held on the sixth this vote was rescinded, and twelve written charges against the commissioners, relating to matters covered by the investigation and report of the aldermanic committee, were presented by the mayor. A copy of these charges was mailed to each commissioner on the seventh, with a notice to appear and answer them at 7:30 P. M. of the following day. All the commissioners appeared at the time appointed, when the proceedings were had which are the subject of the present complaint.

At the opening of the hearing counsel for the commissioners objected to having Mayor Burke and Aldermen Crane and Boucher act in the matter, on the ground that they had disqualified themselves from acting in a judicial capacity by the part they had taken in the aldermanic investigation. This objection having been overruled, objection was made to most of the charges on the ground that they were too indefinite to require an answer, and to some on the ground that the matters alleged did not constitute bad conduct under the provisions of the charter, and to others on the ground that they had been previously investigated and passed upon. These objections having been severally overruled, the commissioners objected that a reasonable time had not been given to prepare their defence, and asked that the hearing be adjourned for that purpose. This was refused and the hearing proceeded.

The proceedings had before the aldermanic committee were stenographically reported, and the transcript, which consists of 151 long typewritten pages, is before us as an exhibit of the petitioners. Several pages of items, certified to by the accountant as having been correctly taken from the books of the water department, which are frequently referred to in the testimony, are before us as an exhibit of the petitionees. None of this evidence was sworn to. Other exhibits of the petitionees are the report made by this committee to the board of aldermen, and a report made to the aldermen by a previous committee on some of the matters covered by these charges. Portions of the report made by this committee, and of the evidence taken by it, and of the tables prepared by the accountant, and of the earlier aldermanic report, constituted all the evidence presented to the city council. The commissioners objected to this evidence as hearsay, and for the failure to produce the witnesses and the original

papers and books. At the close of the evidence the commissioners moved that the charges be dismissed, on the grounds that no legal or competent evidence had been given in support of them, that such evidence as had been given was evidence taken in a different investigation, and that the committee taking that evidence had no legal authority to investigate the water commissioners.

The commissioners' application for an adjournment to enable them to prepare their defence was refused by the petitionees on the ground that the commissioners were entirely familiar with the charges and the testimony relating to them; and the refusal is now justified by counsel on the same ground. The petitionees have taken testimony showing the management and condition of the water department since the removal of the petitioners, as compared with its management and condition during their incumbency, and claim that this shows an improvement of such advantage to the city that the court may properly refuse the writ in the exercise of its discretion. These claims seem to require a mention of all the charges insisted upon at the hearing before the city council, and some presentation of the matters complained of, as shown by the transcript of evidence and other documents which afforded the basis of the action taken.

It was charged that two of the commissioners were guilty of negligence in not taking action with reference to the conduct of Superintendent Kidder towards Miss Kitty McCaffrey and her sister at the time he discharged them. There was evidence before the aldermanic committee which tended to show abusive treatment of these employees in connection with their discharge. It did not appear that they brought the matter before the commissioners. The occurrence was two years prior to the investigation.

The commissioners were charged with incapacity in installing as an auxiliary to the filtration plant, at an expense of $1,800, an engine which was not adequate to the work. The engine was of an approved pattern, but was paid for without testing, and there was much contradictory assertion as to its capacity. The committee had it tested in their presence during their investigation and pronounced it useless, but the sufficiency and accuracy of the test were questioned in further evidence.

The commissioners were charged with bad conduct in allowing the superintendent to dispose of junk without any returns

being made to the city.   The superintendent admitted disposing of two or three small lots of junk for which he had received no pay, and which did not appear on the books; giving as a reason for this omission that he did not want the commissioners to know that he had been foolish enough to deal with such men.   The committee reported that the superintendent did not profit by these transactions.

The commissioners were charged with bad conduct in allowing a hot water furnace to be taken from the department and installed in Commissioner Simays' house, without a charge being made and without payment.   This complaint relates to a boiler and radiators which were taken out of the City Hall when changes were made in its heating plant.   It appeared in the investigation that before the property was delivered to Simays there had been three offers for it, and that it had been charged to one Martelle whose offer was $60.   The superintendent's explanation was that Martelle concluded not to take the property because it was manufactured in Canada and it would be difficult to get parts when needed for repairs.   There was nothing on the books connecting Commissioner Simays with the property.

Commissioners Rutter and Jones were charged with bad conduct in allowing the purchase of cement from a concern in which Rutter was a stockholder, at a price in excess of that for which another department of the city was then obtaining cement; and because such purchase was in violation of a section of the City Charter which provides that no city official shall furnish any material for which he shall receive more than $25, unless the contract was awarded upon advertised bids.   Vouchers were presented to the committee which sustained the charge as regards price.   It appeared that an aldermanic committee had investigated the same matter two years before, and had reported the difference in price and suggested further inquiry, but that no further action had been taken.

Commissioner Rutter was charged with bad conduct in connection with the drawing of manure by the department team to his own grounds and to the grounds of Superintendent Kidder. The manure from the department stables seems to have been considered a perquisite of Cassidy, for many years the foreman in charge of the team work, and after his death it seems to have been given by the superintendent to any of the employees of the department who wanted it.   Mr. Kidder stated that he

treated the manure matter lightly, and thought it should be so treated; and he mentioned three or four others who had had some of it besides Rutter and himself.

The commissioners were charged with bad conduct in allowing the superintendent to do a large amount of private work contrary to a provision of the ordinances. Mr. Kidder conceded that such work had been done, and frequently for parties outside the city, and justified the practice as an assistance in emergencies and because the city had some appliances not owned by plumbers generally. We have not been referred to any ordinance which in terms prohibits this. The committee considered the matter satisfactorily explained.

The commissioners were charged with making special rates in violation of a city ordinance. The instance specified was the giving of special rates to the campers at Starr Farm Beach, who number about thirty and use the water about two months. Chapter 2 of the ordinances contains the provisions governing the water department, and our references are to the sections of that chapter. The charter requires the city council to establish rates, and §34 provides that the water commissioners shall from time to time submit to the city council such proposals of amendment of the rates as they may deem to be for the interest of the city. Section 11 provides that the same compensation shall be received for water furnished for public use as for the same service rendered to a private individual or corporation, and concludes: "There shall be no special rates for water." The reasonableness of the arrangement under consideration was not questioned.

The commissioners were charged with bad conduct in furnishing labor and material without charge. The matters complained of here were the furnishing of meters and the making of service attachments without compensation. Section 2 provides that in making service attachments, one-half inch lateral pipes shall be laid by the city from the water main to the line of the street. Provision is made in §24 for furnishing property owners with meters of one-half inch delivery on their paying the cost of setting; while §29 provides that the city may put in a half inch meter at its own expense and charge for measured water instead of schedule rates, but that "in no case * * * will the city be to the expense of furnishing or setting a larger meter." Sections 2 and 25 provide that "applicants desiring a service or meter of

larger than one-half inch delivery may secure such facilities * * * on the payment of such sum, approximately representing the extra cost of the larger meter and installing the service, as the water commissioners may determine * * *.'' The evidence presented to establish violations of these provisions consisted of several pages of items collected from the books of the department kept during four years of Mr. Kidder's incumbency. These pages are headed in part, ''Evidence taken from the books of the Burlington Water Department,'' and are attached to the certificate of the accountant before mentioned. They contain about twenty entries where meters of over one-half inch delivery were furnished without charge, and a larger number where service connections were put in without charge. These are interspersed among a greater number of entries where charges were made in similar cases. As regards the meters, Mr. Kidder explained that some of them were sold and some not, that this was in accordance with previous practice, and that the city was not a loser. As regards the service, mention was made of three or four instances where the ditch was dug by the owner or builder or the pipe laid in the trench dug for the sewer. Other than this, there was no specific denial or explanation of the several items.

The commissioners were also charged with having allowed rebates on water bills in violation of the City Charter. In support of this the mayor presented a statement, also covered by the certificate of the accountant, which, so far as appears from the exhibit before us, consisted of two sheets containing twenty-one items, showing changes from the amounts charged to lesser amounts; generally explained as allowed to prevent freezing, and sometimes as allowed on account of leaky closets or faucets. An ordinance of the city provides as follows: ''All persons taking water must keep the fixtures and service pipe within their own premises in good repair and fully protected from frost; and must prevent all unnecessary waste of water. The city shall not be liable for leakage of hydrants, pipes or fixtures, upon the premises of the taker, nor for any obstruction therein by frost or otherwise, nor for any damage resulting from any of the foregoing causes.'' The only answer made to this charge was a reference to various troubles that were avoided by this means, and a presentation of several extracts from the published journals of the New England Water Works Association on the subject of freezing and the best methods of coping with the difficulty.

The proceedings at the meeting of the city council in which the charges against the commissioners were considered, were stenographically reported by the procurement of the attorney for the commissioners, and the reporter's transcript thereof was offered as a part of the deposition of such attorney, and was conceded by the petitionees' counsel to be a correct transcript, and was received without objection. Our knowledge of what was actually presented for the consideration of the city council is to be gathered from this report, and from the papers shown by it to have been brought before the council in support of the charges.

In support of the McCaffrey charge the mayor submitted the findings of the investigating committee. The only finding of the committee was that the two sisters were faithful and efficient employees of the office. In support of the charge regarding the auxiliary engine the mayor said in substance that he submitted the findings of the committee as determined by their test. The committee reported that in testing the engine they found that as an auxiliary it was useless and an unnecessary expense. As to the charge regarding junk the mayor said: "In support of that I submit the testimony which I have read to you." There is nothing to show what testimony upon that point was read to the council. Taking up the charge regarding the hot water furnace, the mayor said he would submit the statement of Mr. Evans, the accountant, showing that there was no record of any such sale. Evans was not a witness before the committee on this subject. It appears from the transcript of that hearing that the mayor read into his statement the following: "I have examined the charge of the material and labor to see if there had been a sale of a hot water heater or furnace made during the past year, but found no record of such. E. G. Evans." Whereupon the reporter noted: "Copy of paper read given to committee and Mr. Kidder." No such paper is contained in the exhibits we have.

Taking up the charge regarding the purchase of cement, the mayor said: "I will submit a statement taken from the books of the department by Mr. Evans;" and thereupon gave, as a matter shown by the record, the different prices of two lots of cement. The mayor then started to offer a copy of an invoice of certain cement purchased, but upon objection being made withdrew the offer, and presented the latter part of the report of the first investigating committee. The latter part has no rela-

tion to the cement purchase, and there is nothing to show that the part which afforded the basis for a comparison of prices was read to the council. A statement which purports to have been taken from certain vouchers relative to purchases of cement from the company with which Mr. Rutter was connected is attached to the report of the first investigating committee as submitted to us.

Coming to the charge regarding the manure, the mayor said: "In support of that I submit the evidence and report of the committee." Nothing further appears. Concerning the charge that private work was allowed, the mayor said the records showed that this had been done contrary to the ordinances, but made no specific reference to any record. As to the charge of making special rates, the mayor said: "I will submit the findings of the report of Mr. Evans," and thereupon specified certain takers and the rates given, apparently reading from some statement. The transcript of the proceedings before the committee contains the following: "Mr. Burke read report relating to establishing water rates and offered evidence of a documentary form taken from the books of the department relating to establishment of rates at Starr Farm Beach * * *. Report given to committee." This report is not among the papers furnished us.

Taking up the charge for furnishing labor and material to favored persons, the mayor said, apparently reading the heading of the Evans statement, "Evidence taken from the books of the water department for service put in over one-half inch," and asked whether all should be read; whereupon it was moved and voted that only a part of them be read. The mayor then read, omitting the names of the owners, five or six items where service or meter or both were furnished without charge, and gave by name two instances where meters were charged.

In support of the charge regarding rebates on water bills, the mayor presented twenty items where changes had been made in reduction of the amounts charged. The presentation appears to have been an incomplete reading from data furnished by the accountant. Only five of these items correspond to items contained in the exhibit as submitted to us. But there are three others which correspond to items given to the aldermanic committee. And three were given to that committee which do not appear either in the list presented to the city council or in the exhibit. In the hearing before the committee, the mayor pre-

sented his statement as from a list furnished by Mr. Evans, and at the close of his statement the reporter noted, ''Copy of report furnished committee and Mr. Kidder.'' It seems reasonably certain from the record itself that there were originally other pages in the exhibit from which the mayor presented the remaining fifteen items contained in his statement to the council.

The hearing was concluded at one sitting. After the preliminary objections were disposed of, and before taking up the charges, the council voted that the charges be considered as a whole, and at the close of the hearing they were acted upon as a whole and sustained by a vote of seven to six. The council then rescinded its action of July third in electing commissioners, and thereupon passed a vote removing Water Commissioners Rutter, Jones and Simays from office and declaring the offices vacant. The council then went into executive session; and it appears from evidence taken on the petition that other commissioners were elected at that time, and that these commissioners soon after removed Kidder from the superintendency and appointed W. H. Wilson to fill the vacancy, and that Wilson restored Heininger to his old place.

The petitionees' brief lays stress upon the words of the charter which give the city council the power to remove its appointees for such causes of incapacity, negligence and bad conduct ''as to it shall seem sufficient.'' It is said that this gives the appointing power the right to remove in its discretion, or at its pleasure. But the discretion is clearly limited to cases where one of these causes is found to exist. If there is evidence tending to establish such a cause, the weight of the evidence and the sufficiency of the cause are for the city council to determine, and its action therein will not be reviewed. But there must be something which in law amounts to incapacity, negligence or bad conduct, to sustain the removal. In *Ayers* v. *Hatch,* 175 Mass. 489, 56 N. E. 612, the charter gave the mayor the power to remove for such cause as he should deem sufficient, and the court said that the fact that removals were to be for cause repelled the idea of removal at pleasure, although the sufficiency of the cause was for the mayor to decide. In *Speed* v. *Common Council*, 98 Mich. 360, 57 N. W. 406, 22 L. R. A. 842, 39 Am. St. Rep. 555, 563, the court speaks of the well established rule that an authority to remove for cause excludes the power to remove at will. Moreover, this charter provides that the water commissioners shall be ap-

pointed for a term of three years and until their successors are qualified.  Officers appointed for a definite term are removable only for cause in the absence of an express authority to remove at pleasure.  28 Cyc. 436; *Field* v. *Malster,* 88 Md. 691, 41 Atl. 1087.  The fact that a term is of definite duration is held to negative any inference of the existence of this authority.  *State ex rel. Gallagher* v. *Brown,* 57 Mo. App. 199.  The appointments here were for a definite term.  The term was to continue three years at least, and as much longer as there should be no qualified successor.  *Miles* v. *Stephenson,* 80 Md. 358, 30 Atl. 646.

It is clear that some of the cases specially relied upon by the petitionees do not support their contention.  In *Carter* v. *Durango,* 16 Col. 534, 27 Pac. 1057, 25 Am. St. Rep. 294, the tenure of the office was at the pleasure of the appointing power.  In *Williams* v. *Gloucester,* 148 Mass. 256, the charter gave the mayor and aldermen full power to remove at pleasure, and the court held that a further provision, now quoted by counsel, could not be construed to cut down the power conferred as above.  In *State* v. *Williams,* 6 S. D. 119, 60 N. W. 410, the mayor was authorized to remove any officer appointed by him whenever he should be of the opinion that the interests of the city demanded it, but was required to report the reasons for such removal to the council at its next regular meeting; and it was held that the last provision did not constitute a limitation upon the mayor's power of removal.  In *O'Dowd* v. *Boston,* 149 Mass. 443, 21 N. E. 949, a deck hand on a city ferry-boat was discharged for drunkenness, and sued to recover for wages subsequently accruing. The statute, which applied to all the departments of the city government, authorized the officials to remove their subordinates for such cause as they might deem sufficient and should assign in their order of removal.  The court considered that the intention of the statute was "to qualify a removal at pleasure by requiring a record to be made of the cause."  We think other cases cited are fairly distinguishable from the case in hand.

The petitionees claim that the real purpose of the proceeding is to test the title to these offices, and that in such cases *quo warranto* is the proper remedy, and that where that remedy is available *certiorari* will not lie.  This argument is based upon a misconception of the legal situation.  The question here is whether the petitioners have been unlawfully interfered with in the enjoyment of an office to which they had an unquestioned

title. The fact that the inquiry may result in a determination which will indirectly affect the title of subsequent incumbents does not determine the remedy. Where a person in possession of an office is ousted therefrom and his successor elected, and he desires a review of the proceedings had in ousting him, on charges of illegality or irregularity, *certiorari* and not *quo warranto* is the appropriate process. 4 Ency. Pl. & Pr. 106. And see *State* v. *City Council,* 39 N. J. L. 416; *Board of Aldermen* v. *Darrow,* 13 Col. 460, 22 Pac. 784, 16 Am. St. Rep. 215.

So the petitioners were not removable at pleasure, and have not mistaken their remedy for an unlawful removal. Before taking up severally the matters which are claimed to invalidate the action of the city council, we refer briefly to the nature of that body and the general rules pertaining to its procedure.

A city council is primarily a legislative and administrative body, but is often charged with judicial or *quasi* judicial functions. When sitting upon charges involving removal for cause, it acts in the latter capacity. But even here, it may be subject to judicial review only in part, and in part be vested with discretionary power. Under ordinary charter provisions, the mayor may sometimes be entitled to act in a dual capacity. Although a constituent part of the city council, he is specially charged to see that the ordinances are enforced and the duties of subordinate officers faithfully performed. Inquiries involving removal for cause being of a judicial nature, the person charged is entitled to notice, and an opportunity to be heard, and a reasonable time to prepare his defence. But the proceeding being of a summary character, and designed to accomplish an administrative purpose, a full compliance with the rules governing trials in court is not required.

The petitioners claim that the mayor's connection with the case as accuser, prosecutor and witness, disqualified him from participating in the final vote. It is true that the mayor prepared, signed and presented the charges, and introduced the evidence supporting them and emphasized his belief in its truth, and that he afterwards gave the vote which determined the case against the petitioners. But we think the constitution of the city council, its exclusive jurisdiction as a trier, and the diversity of the duties imposed upon it, preclude the idea that impartiality can be made the test of the right of its members to sit in a hearing affecting the subordinate officers of the city government.

There are authorities which seem to sustain this view. *Andrews* v. *King*, 77 Me. 224; *Barrett* v. *Board of Comrs.*, (N. J.) 88 Atl. 856. In the latter case it was said of the one whose disqualification was claimed: "He was constituted by statute one of the governing board of the city, and charged by law with the investigation and trial of offences of this character by city officials. The fact that a charge was pending against him of a similar nature did not deprive him of the capacity and power to try an official appointed by the commission who was charged with violating his official duty." But while the mere fact that the mayor has presented and is pressing the charges will not render his vote illegal, it is quite possible that the management and conduct of the trial by one acting in the duplex relation complained of might be such as to afford the basis of a judicial review.

It is claimed that the charges were too indefinite to give validity to the proceedings. It is not necessary that charges of this nature have the formality and completeness required in court proceedings, but they must be such as will fairly inform the officer of the accusations upon which he is to be tried. It is certain that some of these charges were sufficiently specific, and further reference will be made to them severally as occasion may require.

The petitioners object that the charges were not brought in good faith, and refer us to certain depositions taken in support of the petition and to a statement incorporated by the mayor in the charges presented to the aldermanic committee. It is not necessary to inquire as to this. If the removal was made for a legal cause, on proceedings sufficiently regular, the mayor's motive in presenting the charges is immaterial.

The petitioners contend that they were entitled to have the evidence confined to what was legal and competent, and object on several grounds to the evidence received. It is said that none of it was given under oath. Sometimes it is stated broadly that tribunals of this class are not bound to conform to the legal rules regarding evidence; but this is not to be taken as justifying a disregard of fundamental requirements in cases of removal for cause. If the charter is silent as to the mode of procedure in such cases, the substantial principles of the common law as to proceedings affecting private rights must be observed. 1 Dill. Mun. Corp. §253, 1st ed. It is certainly a fundamental rule of the common law that evidence in an adversary proceeding in a

court of justice is to be given under the sanction of an oath. . A city council engaged in a hearing involving a removal for cause is acting in a judicial capacity, and is to be considered a court for that particular purpose. *Matter of Nichols*, 6 Abb. N. C. 474. Although not a court in the strict sense, its duty is so far judicial that it cannot dispense with this prerequisite of a judicial inquiry. *People* v. *Police Comrs.*, 155 N. Y. 40. 49 N. E. 257. Moreover, the charter of the city seems to contemplate that the witnesses in these hearings shall be sworn, for it 'provides that ''the mayor shall have power to administer oaths in all cases proper for the administration of an oath before the city council.''

But we think it was not essential, in this proceeding against the water commissioners, that the pages of items relating to rebates, gathered from the books of the water department, should be verified by the oath of the accountant as a witness. The items were certified to as having been correctly taken from the books of the department, and were accompanied by references to the places from which they were taken. The books themselves were in the office of the department in the building where the hearing was had. These books were in the custody of the water commissioners, and were the permanent record of the transactions of their department with its patrons. They were at the time, and were to remain, open to the inspection of all the members of the city government. These facts gave the water commissioners, as the persons accused and on trial, a very substantial protection against inaccuracies resulting from carelessness or fraud.

It is said that some of the evidence consisted of the results of other investigations. As far as this was so, the city council had merely the conclusions of the committee which heard the evidence, and not the evidence itself in any form. It is objected that so far as the evidence taken by the investigating committee was used, the petitioners were deprived of the right to be confronted with and cross-examine the witnesses. Before taking up this matter, it will be necessary to inquire as to the status of the transcript of the evidence taken by the investigating committee.

The office of a writ of *certiorari* is to bring before the court for inspection and review the record of some proceeding of an inferior tribunal. The term ''record,'' in its primary use, does not

include the evidence. But the evidence, or some statement of it, may come up with the record proper, when needed to establish a reviewable matter. To hold otherwise would make the remedy unavailable in cases where it is most likely to be needed. Many inferior courts, and municipal boards exercising *quasi* judicial functions, have no records that will present legal errors of the character complained of here. The petitioners have provided for this difficulty by having the proceedings of the city council stenographically reported, and bringing up by affidavit transcripts of that report, and of the report made of the doings of the investigating committee, to substantiate their claim that there was no legitimate evidence tending to establish a cause for removal. The right of the reviewing court to examine the evidence to determine this question is undeniable. 5 R. C. L. 264; 28 Cyc. 442; Note 12 Am. Dec. 533; *Davidson* v. *Whitehill,* 87 Vt. 499, 89 Atl. 1081.

The case against the commissioners was evidently presented to the city council on the theory that the evidence taken by the aldermanic committee as shown by the transcript was available in the further hearing. The right of a city council to remove for cause upon evidence taken and reported by a committee, if certain requirements have been complied with, is sustained by *Chace* v. *City Council of Providence,* 89 Atl. 1066; a Rhode Island case decided in 1914 on a full review of the authorities. The petitioner in that case objected that he was tried and found guilty by a committee; that the council simply accepted and acted on their report, without any evidence having been placed before it or taken by it; and that he had a right to have the witnesses for and against him produced and examined before the city council itself. The court considered that this claim of right was without foundation in reason or authority; that the taking of evidence by an authorized committee to be acted upon by the whole body was a reasonable and proper procedure; and that no special statute or ordinance was needed to give it validity. The court supported its position by quoting freely from *Osgood* v. *Nelson,* 41 L. J. Q. B. 329; a case relating to the powers of the court of common council of London, the final decision of which was by the House of Lords.

But if we were to adopt the doctrine of these cases it would not avail the petitionees. If the testimony taken by the committee was to be used in the hearing before the council it was necessary that the commissioners have the same notice of the pro-

ceeding and the same presentation of charges that were required for a hearing by the council in the first instance. There is nothing to show that any notice was given or charges served. There is nothing that would justify us in assuming that Mr. Kidder represented the commissioners before the committee. It is true that he spoke several times as if the commissioners were coming in later, and announced near the close of the hearing that they were not coming in. There is nothing in this that carries any implication of an authority to represent.

But if we were to treat the evidence taken by the committee as available before the council, and treat the commissioners as represented at the investigation, it is certain that as to most of the charges the evidence was not properly submitted to the council. In the *Chace* case printed copies of all the evidence was in the possession of the common council four days before the time fixed for the hearing. In the *Osgood* case the evidence was printed and distributed to the members of the council sometime before the case was brought to hearing. The fair implication of these cases is that evidence thus taken must be read to the council unless it has been printed and placed in their hands for reading. With the possible exception of certain documentary evidence taken from the books of the department—which will require a separate treatment—no part of the evidence taken by the committee appears to have been submitted to the city council with sufficient completeness to meet this requirement.

The most important part of the inquiry as regards the administration of the city affairs was that relating to furnishing meters and service connection without charge, and giving rebates to patrons on account of freezing and leaky fixtures. The first branch of this inquiry came in under a charge which, with slight verbal corrections, reads as follows: ''That all three commissioners were guilty of bad conduct, as the records show that labor and material were furnished to favored persons, while charging others the full rates for similar service. A partial investigation only, shows 42 distinct violations of §124 of the City Charter, where labor and material were furnished as above described, amounting in some cases to $100.'' In the charge as originally made to the aldermanic committee, the generality of the opening clause was made more definite in the second clause by a reference to §24 of the ordinances. This definiteness was lost in the charge as afterwards made by an

error which referred the reader to a provision foreign to the subject. Whether the charge as finally made might be held sufficient in the circumstances, it is not necessary to determine. The charge regarding rebates was, with one or two immaterial alterations, as follows: ''That all three commissioners were guilty of bad conduct, as only a partial investigation of the records shows 32 distinct violations of §124 of the City Charter, where favored persons were allowed rebates on their water bills, while other persons paid the regular rate. These rebates run as high as $15 in some cases.'' This has the same erroneous reference, but the subject was so distinctly presented that the error was harmless. This charges a practice of the department, in conflict with the ordinances, and shown by its records; and we think it was sufficiently definite without specifying the instances.

The evidence in support of this charge was read to the city council from an exhibit used before the aldermanic committee, but its presentation to the council did not hinge upon its previous introduction. It stood the same as if the hearing before the city council was the original inquiry. Its effectiveness did not depend upon any part of the oral evidence taken by the committee. It was within the discretion of the city council, for the reasons before mentioned, to receive the statement of rebates collected by the accountant from the books of the department instead of the books, and to receive it on the accountant's certificate of its correctness instead of requiring an oath. Despite the incomplete reading of the exhibit, we think the evidence presented, unexplained, tended to show a practice of the department not justified by the ordinances, which was a legal cause of removal. Whether the commissioners were so placed as to be responsible for the failure to deny or explain, will be considered later.

The case as regards this charge seems to have been presented on the theory that the evidence afforded by the books of the department was conclusive, and that no explanation was possible. Assuming that this is so as regards the legal effect of the evidence, it does not entirely dispose of the claims of the commissioners. The city council has the power of removal, but its exercise in the given case rests in their discretion. On hearing an explanation of all the circumstances bearing upon the commissioners' connection with this practice, they might have concluded that the interests of the city did not require that they be removed.

3

If the council had heard the explanation of the situation given by Mr. Kidder in the aldermanic investigation, it might have received favorable consideration. In this view the commissioners would have been entitled, on claiming the right, to have the oral evidence on the subject go with the exhibit.

It may be well to characterize the inadequacy of the proceeding more particularly,—still giving the petitionees the benefit of the assumptions previously made in recognition of their theory. The hearing before the city council, which was appointed at 7:30, was concluded and the vote taken about nine. It is evident that but a small part of the transcript of the testimony before the aldermanic committee could have been read in that time. There is but one indication in the record that any of it was read. The course of the proceeding indicates pretty clearly that the attention of the council was directed solely to the evidence which supported the charges. There certainly is nothing to show that all the evidence taken by the committee on any one charge was read to the city council. A reference made by the mayor to some piece of evidence as contained in the transcript did not bring it before the council. A statement by the mayor of something that was said by some one in the investigation, and which might be found in substance in the transcript, was not competent evidence. Each piece of evidence of this character was objected to as incompetent, and the objection was well taken. The entire hearing was had under a vote that the charges be considered as a whole. It is evident that the charge regarding rebates was not the subject of any separate consideration.

We have postponed until now the consideration of the question whether the petitioners were given a reasonable time to prepare their defence. All the details previously given regarding the charges and the evidence relating to them have a bearing upon this question. The brevity of the time allowed is justified in the petitionees' brief on the ground that the commissioners were entirely familiar with the evidence relied upon to support the charges; and there is a suggestion in the evidence taken on the petition that this claim stands on the fact that the city papers published accounts of the evidence taken at the several hearings of the aldermanic committee. Something more than this was needed to charge the commissioners with knowledge of the proceedings had at the aldermanic investigation; and, in any event,

the preparation of a defence involves not only some knowledge of what is claimed, but the collection of the means of meeting it. It was necessary for the commissioners to be prepared on all the charges served on them.     Eleven of the twelve were in fact presented to the council.     We think that in view of the short notice given, the commissioners were entitled to an adjournment to enable them to prepare their defence.

But the petitionees contend that if the proceedings complained of are held to be invalid, the circumstances are such that the court ought in the exercise of its discretion to deny the writ. It appears that the new commissioners appointed the chemist of the filtration plant, superintendent of the water works, and by combining these offices saved the city $1,000 annually; that the new superintendent made certain reforms in the methods of the department, the most important of which was in the inspection and repair of the meters, by which a considerable loss of revenue was prevented; that a change was made in the power used for the high service by which about $50 a month was saved; that these changes resulted in reducing the expenses of the department about $50 a month and increasing the revenue for the quarter about $1,000 over that of the corresponding quarter of the previous year.

It is true that the writ of *certiorari* is not a writ of right, and may be refused by the court in its discretion.     But it is not to be refused without giving heed to all the circumstances and considering what the ends of justice require.     It is said that the writ may be refused although there is manifest error, if the judgment appears upon the whole to be right; and that even where prejudicial error is apparent it will be refused if great public inconvenience will result from its issuance.     5 R. C. L. 254.     We think the detriment possible in this case is not such as to bring it within the class above described, and are not disposed to withhold the remedy.     But there seems to be no disposition to deny that improvements have been made in the administration of the water department since the investigation, and we are inclined to believe that the benefit which has accrued to the city will not be lost by decreeing the invalidity of the action of the city council.

*Petition sustained, issuance of writ ordered, and proceedings ordered to be quashed on being certified to this Court.*