2015 VT 5

# Ralph Nelson v. Town of St. Johnsbury Selectboard, Rodney LaMotte, Kevin W. Oddy, Alan Ruggles, James L. Rust, Bernard Timson and Town of St. Johnsbury

[115 A.3d 423]

No. 13-386

Present: Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.[1]

Opinion Filed January 16, 2015

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Richard T. Cassidy* of *Hoff Curtis*, Burlington, for Plaintiff-Appellant.

*John T. Leddy* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan*, Burlington, for Defendants-Appellees.

¶ 1. **Dooley, J.** Plaintiff Ralph Nelson, the former town manager of St. Johnsbury, appeals from a trial court decision granting partial summary judgment to defendants, the Town of St. Johnsbury and its individual selectboard members (collectively "the Town"), on his claims of wrongful termination; violation of procedural due process under the Civil Rights Act, 42 U.S.C. § 1983; violation of Chapter I, Article 4 of the Vermont Constitution; and promissory estoppel. We reverse and remand on the trial court's dismissal of the wrongful termination, Civil Rights Act, and state constitutional claims. We affirm the court's dismissal of the promissory estoppel claim and its grant of summary judgment on the qualified immunity defense.

¶ 2. In September 2010, the selectboard formally hired plaintiff as town manager after he served briefly on an interim basis. There is no evidence that the parties negotiated or agreed upon any specific contract terms for plaintiff's employment. According to plaintiff, the Town's attorney advised him on three separate occasions that he could be removed only for serious misconduct, which the attorney assured was "an extremely high bar."

¶ 3. As town manager, plaintiff undertook a major project to renovate and lease the Town's Pomerleau Building. He apparently gained voter approval on a renovation budget and negotiated a lease with a potential tenant. The selectboard contends that plaintiff made certain misrepresentations about the proposed lease, which plaintiff denies. On March 16, 2012, selectboard chair, James Rust, informed plaintiff that the board had concerns about his performance and gave him a letter stating that the board would be conducting an inquiry and that "[r]efusing to answer, answering incompletely, or answering untruthfully, questions relating to work is considered misconduct for which an employee may be disciplined up to and including dismissal." The letter never stated the nature of the inquiry, only that plaintiff was obligated to cooperate.

¶ 4. Selectboard member Kevin Oddy conducted the inquiry into plaintiff's performance and drafted a list of concerns, including allegations that plaintiff sexually harassed employees, created a hostile work environment, attempted to influence a school board member, and lied. No details were provided in the list, and there is no evidence the list was disclosed to plaintiff. On April 2, 2012, Rust informed plaintiff that the inquiry had turned up "something" and that the selectboard would be holding a meeting to

discuss plaintiff's job. Rust would not tell plaintiff what had turned up. He requested that plaintiff hand in his keys and laptop computer[2] and go home, and plaintiff complied.

¶ 5. On April 3, 2012, Rust called plaintiff and notified him that the selectboard would be meeting that evening but that plaintiff was not obligated to attend. Plaintiff nonetheless attended. When the meeting convened that evening, the selectboard immediately recessed to executive session. After forty-five minutes, the board asked plaintiff to join them, at which time they discussed the proposed lease. According to the selectboard members, they also questioned plaintiff about the other allegations concerning his job performance, but plaintiff denies this. The selectboard asked plaintiff if he wanted to resign, and he declined. Consequently, the board returned to public session and passed a vote of "no confidence." According to plaintiff, he did not understand until that time that the selectboard was terminating his employment.

¶ 6. On April 4, 2012, the Town issued a press release announcing plaintiff's termination, stating that "[t]he Manager holds office at the will of the Board" and "the Town terminated . . . [plaintiff] for certain actions . . . that went directly against the will of the Board and were misrepresented by . . . [plaintiff] to the Board." Rust calculated that the proposed lease would have resulted in a substantial loss for the Town, and the Town eventually negotiated a more favorable lease.

¶ 7. Plaintiff filed suit against the selectboard and its individual members, claiming: (1) wrongful termination; (2) deprivation of due process of law in violation of the Civil Rights Act, 42 U.S.C. § 1983; (3) violation of Chapter I, Article 4 of the Vermont Constitution; and (4) promissory estoppel. Plaintiff sought a preliminary injunction reinstating him as town manager; compensatory and punitive damages; and attorney's fees and costs. After a hearing, the trial court refused to grant a preliminary injunction on the ground that plaintiff had an adequate remedy at law and was not entitled to equitable relief. The Town filed a motion for partial summary judgment on the counts of plaintiff's complaint for which he sought reinstatement or damages for his termination, and the trial court granted this motion. The court held that

---

[2] The Town's actions with respect to the laptop computer, which was owned by plaintiff, are the subject of claims in plaintiff's complaint. They are not part of the Town's motion for partial summary judgment and therefore are not part of this appeal.

plaintiff has no legal interest in his employment because his employment was at will; the selectboard members are entitled to qualified immunity for their alleged violation of the Civil Rights Act, 42 U.S.C. § 1983; plaintiff has no private right of action for a violation of Chapter I, Article 4 of the Vermont Constitution; and plaintiff failed to satisfy all the required elements of promissory estoppel.[3] This appeal followed.

¶ 8. "We review summary judgment decisions de novo, using the same standard as the trial court." *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 9, 197 Vt. 176, 102 A.3d 1101. Summary judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party, "there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quotation omitted); see V.R.C.P. 56(a).

¶ 9. Before we turn to the specific claims, we stress that the lynchpin of this appeal is whether plaintiff could be terminated for any reason or only for cause. This question is controlled by 24 V.S.A. § 1233, the statute providing for termination of a town manager in the absence of a contract between the manager and the town. On this central question, plaintiff claims that the statute allows removal only for cause and that the Town lacked cause for his termination. He further argues that because he could be removed only for cause, he was entitled as a matter of due process to notice of the alleged cause for removal and a hearing at which he could contest the presence of cause, and that he did not receive these procedural protections. The Town, in turn, argues that plaintiff's employment as town manager was terminable at will under § 1233 and that, because it was terminable at will, plaintiff had no property interest in his job and no right to due process. These positions frame the central issue in this appeal.

¶ 10. The Town raised additional grounds on which it asserts it should prevail even if it loses on the lynchpin issue. With the exception of qualified immunity, these grounds were not considered by the trial court. For the reasons discussed below, we conclude that the summary judgment record is too limited to

---

[3] The counts dismissed were Counts I-V of plaintiff's amended complaint. Plaintiff had moved to amend the complaint to add the Town of St. Johnsbury and omit the St. Johnsbury Selectboard, but not the individual selectboard members.

consider these additional grounds. We do consider whether the selectboard members are entitled to qualified immunity, but leave the consequence of such a holding to the trial court.

## I. Wrongful Termination

¶ 11. With this background in mind, we turn first to plaintiff's wrongful termination claim. Plaintiff claims that he could be removed only for cause but that he was terminated for no cause and is entitled to relief. The resolution of this issue depends upon the interpretation of 24 V.S.A. § 1233, which provides, in relevant part, that the town manager "shall be subject to the direction and supervision and shall hold office at the will of such selectmen, who, by majority vote, may remove him at any time for cause." We are confronted with a statutory provision that appears internally inconsistent, both stating that the town manager serves at the will of the selectboard and requiring cause for removal. The trial court attempted to reconcile the conflicting terms, concluding that a town manager may be hired either at will pursuant to the statute or under a contract that modifies the statutory provision by providing for a specific employment duration. It then reasoned that if the town manager is hired at will, the selectboard may terminate that person at any time for any reason — with or without cause — but if the town manager has negotiated a contract for a fixed term, the selectboard can remove that person only for just cause. Because the court found no contract here, it concluded that plaintiff's employment was at will.

¶ 12. ■ We start with the plain language of the statute and will enforce it according to its terms if the language is clear and unambiguous. *In re Porter*, 2012 VT 97, ¶ 10, 192 Vt. 601, 70 A.3d 915. Although both parties assert that the language of § 1233 is clear, we cannot agree that a statute with contradictory terms is unambiguous. We therefore must look beyond the plain language to determine the legislative intent, either probing into the legislative history or resorting to canons of statutory construction. *Id.* In this process, we are dealing with a statute that was enacted in 1917, see 1917, No. 104, §§ 2, 6; was codified in 1918, see 1918 G.L. § 4055; and has not been amended since. We have no direct evidence of the intent of the 1917 Legislature. Accordingly, we must determine the intent from the context of the statute in its entirety, *Brownington Ctr. Church v. Town of Irasburg*, 2013 VT

99, ¶ 9, 195 Vt. 196, 87 A.3d 502, as it existed when drafted and as it exists today.

¶ 13. Part of the statute's context is the meaning of the words and phrases used at the time of its enactment in relation to the meaning of those words and phrases today. Many of our modern terms-of-art likely would be foreign to the nineteenth- and early-twentieth-century drafters. The terms "at the will of" or "at will" as used today clearly connote employment that is terminable at any time for any reason. See, e.g., *Handverger v. City of Winooski*, 2011 VT 130, ¶ 2, 191 Vt. 556, 38 A.3d 1153 (mem.) (defining at-will employee as one who may be dismissed at any time without cause). The term, as it relates to employment,[4] is not used in Vermont's statutes at least through the 1940s[5] and received only brief mention in our early case law. See *Mullaney v. C.H. Goss Co.*, 97 Vt. 82, 87, 122 A. 430, 432 (1923) (discussing at-will presumption for employment contract with indefinite duration); *Rutter v. Burke*, 89 Vt. 14, 26, 93 A. 842, 848 (1915) (stating that "an authority to remove for cause excludes the power to remove at will").

¶ 14. Although the "at will" terminology may not have been employed widely by the Court or the Legislature, the *concept* of at-will employment was recognized in a number of early statutes. The Legislature, however, used the terms "at the pleasure of" or "during the pleasure of" to signify at-will employment. See, e.g., 1933 P.L. § 396 ("The governor . . . shall appoint an executive clerk and an executive messenger for the term of two years to serve him when the general assembly is in session and may remove them at pleasure."); 1906 P.S. § 347 ("Said [state fair] commission may appoint and remove at pleasure a superinten-

---

[4] Early Vermont statutes do address leases at will and estates at will but do not use the term "at will" in the context of employment.

[5] See, e.g., Vermont Statutes, Revision of 1947; Public Laws of Vermont, 1933; General Laws of Vermont, 1917; Public Statutes of Vermont, 1906; Vermont Statutes, 1894; Revised Laws of Vermont, 1880; General Statutes of the State of Vermont, 1862; Compiled Statutes of the State of Vermont, 1851; Revised Statutes of the State of Vermont, 1839; Laws of Vermont of a Public and Permanent Nature, 1834; Laws of the State of Vermont, 1808.

To determine that these terms were absent in early laws of Vermont, we conducted a keyword search in the HeinOnline Legal Research Database, http://home.heinonline.org, which contains a searchable database of Vermont laws and public acts from 1808 through 1947. Our search returned no results relating to employment, with the exception of the 1917 town manager statute.

dent . . . and may prescribe their duties and fix their compensation."); 1894 V.S. § 4001 ("[The] board of directors [of the bank] shall have the general management of the affairs of the association . . . and may appoint a cashier and such other officers and agents as their business requires, and remove them at pleasure."); 1840 R.S. ch. 68, § 1 ("There shall be an inspector general of beef and pork, to be appointed by the governor, and to be by him removed at pleasure."); see also *First Nat'l Bank v. Briggs' Assignees*, 69 Vt. 12, 19-20, 37 A. 231, 233 (1894) (discussing authority of appointing power to remove appointee who is terminable at pleasure). But, prior to at least 1947, the town manager statute was the only Vermont statute to use the phrase "at the will of." On the other hand, "pleasure" was used liberally both before and after 1917. In fact, § 1233 remains the only statutory provision to use the term "at the will of" with respect to employment. The failure of the Legislature to use the traditional language to describe the power to terminate employment without cause, and the lack of any precedent for the terminology used, suggests that the Legislature may have viewed the language as having a different meaning from what it means today.

¶ 15. ■ While the "at will" terminology is virtually absent in Vermont's early laws, the term "for cause" appears quite frequently, including alongside the town manager statute in the codification of laws regulating town officers. See 1917 G.L. § 3992 ("[T]he overseer of the poor shall be under the control and direction of the selectmen, and may, for cause, be removed by them."). And the term was recognized by the courts as placing a limit on the discretion of employers to terminate employment at will. See *Rutter*, 89 Vt. at 26, 93 A. at 848 (stating that under city charter that requires cause for removal "there must be something which in law amounts to incapacity, negligence or bad conduct, to sustain the removal"). The Legislature continues to use the term "for cause" as a limit on an employer's removal power, even absent use of the word "only." See, e.g., *Turnley v. Town of Vernon*, 2013 VT 42, ¶¶ 13-19, 194 Vt. 42, 71 A.3d 1246 (recognizing that 24 V.S.A. § 1931(a), which states that officers "shall hold office during good behavior, unless sooner removed for cause," authorizes town to remove police chief *only* for cause). Clearly the Legislature was cognizant of the term "for cause" and its import and must have been aware of the force it would have when incorporated into the removal provision of the town manager

statute. We believe this word choice fairly signals the Legislature's intent to limit the selectboard's removal power. Cf. *Longe v. Boise Cascade Corp.*, 171 Vt. 214, 223, 762 A.2d 1248, 1256 (2000) (concluding that legislative intent was clear because Legislature knows how to impose duties on employers and create equitable tolling provisions but chose not to with respect to workers' compensation statute).

¶ 16. The dissent rebuts our reasoning that the "at the will of" terminology may have held a different meaning to the Vermont Legislature a century ago by detailing the history of the at-will employment doctrine and citing to a number of out-of-state cases that recognize this doctrine. *Post*, ¶¶ 70-83. We do not dispute the dissent's conclusion that the doctrine was well-established nationally, nor do we contest that other states used the at-will terminology more freely. Rather, we merely observe that, in light of our own research into early Vermont laws, the term as used in the town manager statute had a different meaning to the Legislature than it likely would if the statute was enacted today.

¶ 17. The organizational structure of the town manager act, entitled "An Act to Authorize the Employment of General Town or Municipal Managers," also supports this analysis. 1917, No. 104. The 1917 Act was comprehensive and contained thirteen sections. *Id.* The statutory language before us today was separated into two parts and located in different sections of the Act. Section 2 provided, in pertinent part:

> Said manager shall, in all matters be subject to the direction and supervision and shall hold office *at the will* of the selectmen, and shall be selected with special reference to his education, training and experience to perform the duties of such office, and shall be appointed without reference to his political belief; and said appointee may or may not be a resident of the town, for which he is appointed.

*Id.* § 2 (emphasis added). Section 6 provided: "The selectmen may, by majority vote, remove the general manager at any time *for cause.*" *Id.* § 6 (emphasis added). The placement of the terms "at the will of" and "for cause" in separate sections suggests that the Legislature believed they addressed distinct subjects and that § 2 did not deal with termination of the town manager. Indeed, the Town's argument requires us to accept that the Legislature included a separate section that was superfluous and unnecessary.

¶ 18. ■ The Legislature authorized a new codification of Vermont laws in 1917.[6] That codification merged the language from § 2 together with the language from § 6 in one sentence, creating the apparent conflict and ambiguity before us. We presume that a codification does not intend to change the substance of the law "unless the contrary clearly appears." *Town of Cambridge v. Town of Underhill*, 124 Vt. 237, 240, 204 A.2d 155, 157 (1964); see also *Weale v. Lund*, 2006 VT 66, ¶ 8, 180 Vt. 551, 904 A.2d 1191 (mem.) (same); *State v. Brennan*, 172 Vt. 277, 282, 775 A.2d 919, 923 (2001) (same). The contrary does not appear in this case.

¶ 19. On this point, we note one final piece of support. Numerous statutes enacted across the country in the nineteenth and early twentieth centuries contained, in various contexts, a general statement that a particular official holds office and employment "at the will of" or "at the pleasure of" the appointing officer and also contained some limitation on the ability of the appointing officer to terminate without cause. See, e.g., Colo. Rev. Stat. Ann. § 31-4-210 ("The city manager shall be appointed for an indefinite term, but he may be removed at the pleasure of the city council for cause."); N.H. Rev. Stat. Ann. § 37:3 (virtually same language as 24 V.S.A. § 1233); Mich. Comp. Laws Ann. § 791.203 ("[The director of corrections] shall hold office at the pleasure of the commission except that he may be removed for cause and only after a public hearing before the commission."); R.I. Gen. Laws Ann. § 45-4-1(c) ("[T]he town council [is entitled] to appoint a tax collector who shall serve at the pleasure of the town council and who may be removed for cause shown . . . ."). We think it unlikely that so many legislatures would have overlooked these internal inconsistencies unless, in their view, the terms held a different meaning.

¶ 20. ■ We also consider whether an interpretation requiring cause for removal is reasonable in light of other canons of statutory construction. Particularly, we are concerned with whether requiring cause for removal renders the term "at the will of" mere surplusage. See *In re Beliveau NOV*, 2013 VT 41, ¶ 13, 194 Vt. 1, 72 A.3d 918 ("Generally, we do not construe a statute in a way that renders a significant part of it pure surplusage."

[6] The drafting was actually done by a commission appointed by the Governor and was not prepared by the Legislature. See 1917, No. 255.

(quotation omitted)). We think not. As discussed above, evidence suggests "at the will of" was not meant in the modern conventional sense. We think this term reasonably can be read to indicate that it is the selectboard — *and no other authority* — that may remove the town manager and that the selectboard has the discretion to initiate termination. We note that, in support of this construction, the statute established no process for termination, but the requirement for cause is still a limitation on the discretion of the selectboard. This reading is consistent with that statute's limitation on the selectboard's discretion in selecting a town manager. See 1917, No. 104, § 2 (requiring selectboard to consider education, training, and experience when selecting town manager and prohibiting selectboard from considering town manager's political belief).

¶ 21. Adopting the Town's reading of the statute, however, would render the term "for cause" superfluous. The at-will employment doctrine inherently allows the employer to terminate employment either with or without cause. There would be no reason to further specify that an employee with an at-will contract may be terminated for cause.

¶ 22. ■ We also consider whether our interpretation adds implied conditions to § 1233. See *Brennan v. Town of Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999) ("We will not read an implied condition into a statute unless it is *necessary* in order to make the statute effective." (quotation omitted)). Again, we think not. The Town argues that plaintiff's reading requires that the word "only" be read into the phrase requiring cause. Nowhere in our statutory or common law do we find precedent to support the contention that the term "for cause" must be qualified by the term "only" to have any legal force.

¶ 23. In its brief, the Town provided us with a litany of cases in support of its construction, none of which we find availing. None of the statutory provisions at issue in those cases presented the internal inconsistency we find in § 1233, and the courts in those decisions found ample additional evidence of legislative intent to authorize at-will termination. We choose to discuss one of these cases from our own Court that provides support for our holding here.

¶ 24. In *Brennan*, we looked at 24 V.S.A. § 4323(a), which stated that "[t]he term of each member [of the planning commission]

shall be for four years . . . [and a]ny member may be removed at any time by unanimous vote of the legislative body." 169 Vt. at 176, 730 A.2d at 603. The commission members argued that because the statute specified a fixed term, they could be terminated only for cause. We disagreed and concluded that the phrase "any time by unanimous vote" meant that the commission members could be removed for any reason, with or without cause. *Id.* at 178, 730 A.2d at 604. We supported that interpretation with evidence from other provisions of the Planning and Development Act that required removal "for cause," noting that the Legislature understood the distinction between removing municipal officers without cause and for cause. *Id.* In *Brennan,* unlike here, the magic words — "for cause" — were not present in the statute. Although there is a presumption that contracts for definite terms require cause for removal, *id.* at 177, 730 A.2d at 604, it is merely a presumption and nothing more. This presumption was overcome by other evidence within both the individual provision and the entire statutory scheme. *Id.* at 177-78, 730 A.2d at 604.

¶ 25. In *Brennan,* we rejected the planning commission members' argument that "the threat of [removal without cause] would interfere with the impartial and independent exercise of their duties" on the ground that the Legislature has made clear its intent to authorize at-will termination. *Id.* at 179, 730 A.2d at 604. Plaintiff similarly asserts that removal without cause would interfere with the town manager's ability to exercise his "independent authority to run the day-to-day affairs of the town" and that therefore we cannot interpret the statute to permit at-will termination. We decline to go that far, and we stand by our statement in *Brennan.*

¶ 26. Finally, on this issue, we address the trial court's construction of the statute. The court attempted to reconcile the phrases of the statutory sentence at issue. While we support the court's approach in reconciling seemingly conflicting language, we cannot agree with its conclusion that the basic employment relationship defined by the statute is one of at-will employment. Thus, we have not adopted the court's decision.

¶ 27. The dissent offers one method of reconciling the contradictory terminology that it claims is more faithful to the language used by the drafters. In the dissent's view, "for cause" as used in § 1233 requires only that the selectboard furnish the former town manager with a statement of its grounds for removal, but not a

hearing or other due process protections. *Post*, ¶ 83. According to the dissent, this approach "preserves the efficiency of the at-will doctrine in municipal employment while also providing at least a basis for the town manager — and ultimately the public — to judge the wisdom and merits of the decision." *Post*, ¶ 83.

¶ 28. In support of its proposition, the dissent cites three Massachusetts cases, *post*, ¶¶ 79-82, none of which we find applicable. The Massachusetts Supreme Judicial Court contemplated two statutes that employ the language "for such cause as [the board] may deem sufficient," *O'Dowd v. City of Boston*, 21 N.E. 949, 949 (Mass. 1889); *Ray v. Mayor of Everett*, 103 N.E.2d 269, 271 (Mass. 1952), and concluded that this language vests broad removal authority in the board to remove at its pleasure. Essentially, the court created a qualified at-will removal power — qualified only by the requirement that the board state the reason for removal. The Appeals Court of Massachusetts addressed a more modern statute in *Fabrizio v. City of Quincy*, 404 N.E.2d 675 (Mass. App. Ct. 1980), which authorized the mayor to "remove the head of a department or member of a board by filing a written statement with the city clerk setting forth in detail the specific reasons therefor." *Id.* at 676 (quotation omitted). The court reached the same conclusion as in *O'Dowd* and *Ray*, noting that the reasons provided in the statement need not be true but merely "reasons for which removal may lawfully be made." *Fabrizio*, 404 N.E.2d at 677. The only "hearing" afforded to the former employee is within the court of "public opinion." *Fabrizio*, 404 N.E.2d at 677; *O'Dowd*, 21 N.E. at 950.

¶ 29. We find the application of these cases to our own statute unpersuasive. First, the language and structure of the Massachusetts statutes are distinguishable from § 1233. The dissent points out that the statutes differ but opines that "they nevertheless suggest a useful general approach to reconciling the latter's seemingly conflicting terms." *Post*, ¶ 83. One may argue that the logic of the courts' interpretation of the Massachusetts statutes is applicable here; the "at the will of" language may be read to embody the same limiting principles as the "deem sufficient" language. This reading, however, fails to account for the precodification structure of § 1233, which placed the terms "at the will of" and "for cause" in separate and distinct paragraphs dealing with different subject matters. The language "for any reason [the board] may deem sufficient" in the Massachusetts

statutes clearly modifies the term "for cause," thereby limiting its effect. The conflicting terms in § 1233 are not so related, and our historical research suggests they were not intended to be.

¶ 30. Furthermore, the dissent cites no Vermont case that allows for such a constrained reading of "for cause." In fact, *Rutter*, 89 Vt. at 26, 93 A. at 848, which was decided contemporaneously with the passage of § 1233, cites another Massachusetts case, *Ayers v Hatch*, 56 N.E. 612 (Mass. 1900), that considers the same "deem sufficient" language as the aforementioned statutes. We cited to *Ayers* for the concept that removal for cause "repelled the idea of removal at pleasure." *Rutter*, 89 Vt. at 26, 93 A. at 848 (citing *Ayers*, 56 N.E. at 613). *Ayers* goes on to hold that the statute at issue did not require notice and hearing but only that there be "good ground" for removal. *Ayers*, 56 N.E. at 613. Contrary to the *Ayers* construction, we acknowledged in *Rutter*, in the face of a charter provision with very similar language — "shall seem sufficient" — that "[i]nquiries involving removal for cause being of a judicial nature, the person charged is entitled to notice, and an opportunity to be heard, and a reasonable time to prepare his defense." *Rutter*, 89 Vt. at 28, 93 A. at 849. While the dissent would have us adopt the constrained reading of the Massachusetts statutes, we did not adopt that reading in *Rutter* or elsewhere, even when confronted with similar language. Rather, *Rutter* highlights the force that the "for cause" language had in Vermont law at the time § 1233 was enacted.

¶ 31. ■ Finally, we are not convinced that the court of "public opinion" is an adequate forum for adjudicating a town manager's wrongful termination claim. We think this interpretation nullifies the purpose of the for cause requirement and the legal force the term has had over the last century. Whether a cause for removal is placed on the record or not, the actions of a municipal board are always subject to public scrutiny. We fail to see how this method encourages proper termination. More importantly, public opposition that results in not reelecting a selectboard member does not provide any remedy for a wrongfully terminated town manager. We therefore conclude that § 1233 requires a town manager be removed only for cause.

¶ 32. Having determined that § 1233 allows termination of a town manager only for cause, we address the Town's argument that cause existed in this case. Because the trial court found that

plaintiff was an at-will employee, it did not address the Town's position. The statement of the selectboard following the meeting in which plaintiff was terminated was: "The Town terminated Mr. Nelson for certain actions performed by Mr. Nelson that were directly against the will of the Board and were misrepresented to the Board." The actions that were "against the will of the Board" and "misrepresented to the Board" were not specified. Plaintiff testified at the hearing on the preliminary injunction that the only issues raised in executive session prior to the selectboard's vote related to the Pomerleau Building and that the selectboard exceeded its powers in second-guessing plaintiff's actions with respect to the Pomerleau Building. In their depositions, select-board members testified that other issues were discussed.

¶ 33. Having held for the first time in this decision that cause is required for termination under § 1233, it necessarily follows that we have not defined what could be considered sufficient "cause" under § 1233. Cf. *Turnley*, 194 Vt. at 50-53, 71 A.3d at 1253-55 (determining what type of conduct qualifies as unbecoming of police officer and justifies dismissal for cause). Based on the record and the positions of the parties, we conclude that, however cause may be defined, summary judgment would be inappropriate because there exists a dispute of material facts with respect to the circumstances under which plaintiff was dismissed. The official vote of the selectboard was that it had no confidence in the town manager. Only through the statement that it issued to the press do we understand that the vote meant that it had terminated plaintiff's employment.[7] The selectboard's statement did not specify what actions were against the will of the selectboard and were misrepresented. On this record, we cannot determine what were the grounds for plaintiff's termination, if any, and whether the grounds existed.

¶ 34. We reverse the trial court's grant of summary judgment to the Town and hold that § 1233 requires cause for removal of town managers. We remand to the trial court to determine whether plaintiff was wrongfully terminated under this standard.

---

[7] Count I of plaintiff's complaint alleges that the no-confidence vote did not terminate his employment and, as a result, he remains the town manager. He has not raised that position here, and the trial court did not address it. We take it that plaintiff has abandoned the position.

## II. Civil Rights Act

¶ 35. We turn next to plaintiff's due process claim. Plaintiff claims that the selectboard members deprived him of his right to due process of law when they terminated his employment without cause and that this action violated the Civil Rights Act, 42 U.S.C. § 1983. He argues that § 1233 vested in him a property interest in his employment that could be terminated only for cause with proper notice of the charges against him and an opportunity to be heard. The Town's primary argument was that the statute authorized no-cause termination and therefore no process was due, and the trial court accepted this argument. The Town, however, has made a number of additional arguments that: (a) plaintiff received notice of the cause for his discharge; (b) plaintiff received a pre-termination hearing consistent with due process; (c) plaintiff waived any right to further process; and (d) the availability of review in the trial court under Vermont Rule of Civil Procedure 75 met the requirement for post-termination due process. None of these arguments were addressed by the trial court.

¶ 36. ■■ To maintain a due process action, plaintiff must show that he has a constitutionally protected right to employment as town manager. See *Quinn v. Grimes*, 2004 VT 89, ¶ 8, 177 Vt. 181, 861 A.2d 1108. We previously have recognized that an employee has a constitutionally protected property interest in employment when the employee "is entitled to a benefit created and defined by a source independent of the Constitution, such as state law." *Id.* (quotation omitted). Employees who are statutorily entitled to employment unless removed for cause have a property interest and "the government may not impinge this right without notice and an adequate opportunity to be heard." *Herrera v. Union No. 39 Sch. Dist.*, 2006 VT 83, ¶ 25, 181 Vt. 198, 917 A.2d 923; see also *Ohland v. City of Montpelier*, 467 F. Supp. 324, 339 (D. Vt. 1979) ("Because he could have been discharged only for cause, plaintiff had a property interest in his employment that was entitled to constitutional protection."). As we held above, § 1233 authorizes the selectboard to remove the town manager only for cause, entitling plaintiff to notice of the charges against him and an opportunity for a hearing.

¶ 37. ■ Once plaintiff has shown a constitutionally protected right to employment, he must then demonstrate that the Town deprived him of that right without adequate notice and opportu-

nity to be heard. *Quinn*, 2004 VT 89, ¶ 8. To meet his burden, plaintiff focuses primarily on the pre-termination process, alleging that the selectboard never specified the grounds for his termination and that he never had the opportunity to respond to those grounds. The Town answers that plaintiff had multiple notices of his deficiencies and had an opportunity to respond to them in the executive session held immediately before the vote to terminate him. Plaintiff's pre-termination rights are explained in the United States Supreme Court case of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), as "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

¶ 38. We have applied the requirements of *Loudermill* in both *In re Hurlburt*, 2003 VT 2, ¶¶ 28-31, 175 Vt. 40, 820 A.2d 186 (determining whether employee was terminated for reasons specified in dismissal letter, as required under *Loudermill*), and *Quinn*, 2004 VT 89, ¶ 24. This case is similar to *Quinn*, where the employer and employee had a meeting, initiated by the employee, but gave very different accounts of what occurred in the meeting. We held that the question of whether the employer complied with the *Loudermill* requirements could not be decided on summary judgment in view of the different accounts. *Quinn*, 2004 VT 89, ¶ 28. We summarized that "[a]lthough we can provide some guidance on these arguments, we believe it preferable that the superior court consider them in the first instance, particularly because the record is so sparse and some additional factual development will be necessary for a decision, by summary judgment or otherwise." *Id.* ¶ 21. We think that holding also applies here.

¶ 39. We reach a similar conclusion with respect to the Town's claims about the post-termination process — that plaintiff waived any right to further process and that his rights were adequately protected by his ability to appeal to the trial court under Rule 75. The summary judgment record is silent on what occurred after the selectboard terminated plaintiff on April 3, 2012. There is no indication that plaintiff had available any post-termination process within the Town government, and there is no indication that he sought any such process. We cannot decide on whether there was a waiver as a matter of law on a silent record.

¶ 40. ▮ We are also, on this record, unwilling to determine whether the trial court review under Rule 75 provided an ad-

equate remedy. The parties have very different visions of how Rule 75 review would proceed, and those visions are affected by the process provided or available from the Town and "the nature of the process due prior to the termination of employment." *Id.* ¶ 29. The Town urges us to ·follow the decision of the United States Court of Appeals for the Second Circuit in *Connolly v. City of Rutland*, 487 F. App'x 666 (2d Cir. 2012), in which the court held that a pre-termination hearing followed by Rule 75 review complied with due process. *Id.* at 667. Even if we were to conclude that Rule 75 review is in all cases an adequate post-termination hearing, *Connolly* holds that such review is adequate only if there is a sufficient pre-termination hearing. See also *Quinn*, 2004 VT 89, ¶ 29 (observing that "the nature of the process due prior to the termination of employment is affected by the nature and availability of post-termination process"). Because we cannot resolve whether there was an adequate pre-termination hearing here, we cannot judge whether Rule 75 review would be an adequate post-termination process.

¶ 41. We reverse the trial court's grant of summary judgment to the Town on plaintiff's Civil Rights Act claim based on a denial of due process and remand for further factual development on whether plaintiff received the process he was due and whether he waived the right to all or any of that process.

### III. Vermont Constitution

¶ 42. We turn next to plaintiff's claim under Chapter I, Article 4 of the Vermont Constitution, which provides:

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character; every person ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; conformably to the laws.

Vt. Const., ch. I, art. 4. Plaintiff claims that the Vermont Constitution provides him with the same due process protections as the United States Constitution and that when the selectboard allegedly deprived him of his employment without due process, that deprivation offended the guarantees of Article 4. The Town contends that Article 4 does not provide a private right of action.

The trial court agreed with the Town and granted its motion for summary judgment. We disagree with the trial court and reverse the grant of summary judgment to the Town.

¶ 43. ■ The trial court relied on *Billado v. Parry*, 937 F. Supp. 337 (D. Vt. 1996), which states that "[t]he Vermont Supreme Court has held that no private right of action is available to enforce Article[ ] 4." *Id.* at 345. The District Court of Vermont, in turn, cited *Rowe v. Brown*, 157 Vt. 373, 599 A.2d 333 (1991), for that proposition. This is a fundamental misreading of *Rowe*. Actually, *Rowe* held that Article 4 does not provide additional private tort remedies to a plaintiff whose public right to open meetings has been violated. *Id.* at 379, 599 A.2d at 337. The holding in *Rowe* merely defined the scope of Article 4; it did not state that Article 4 can never be the basis of an action.

¶ 44. ■ We consistently have held that due process rights flow from Article 4. See, e.g., *Quesnel v. Town of Middlebury*, 167 Vt. 252, 258, 706 A.2d 436, 439 (1997) ("We have considered Article 4 the equivalent to the federal Due Process Clause. . . . It does not create substantive rights, however; it merely provides access to the courts."). Where a substantive right — e.g., a property interest — already exists, conferred by statute or common law, Article 4 can protect a plaintiff against deprivation of that right without due process. See *Handverger*, 2011 VT 130, ¶ 12 (stating that Article 4 "require[s] adequate access to judicial process to vindicate the interest for which due process protection is sought" (quotation omitted)).

¶ 45. ■ The question of whether a private right of action can be based on a provision of the Vermont Constitution may be bifurcated into two questions. The first is whether the constitutional provision is self-executing — that is, whether a plaintiff can bring an action for a violation of the provision without implementing legislation. The second is whether the remedy that a plaintiff seeks, typically damages, exists for the violation.

¶ 46. ■ As we articulated in *Shields v. Gerhart*, 163 Vt. 219, 658 A.2d 924 (1995), a Vermont constitutional provision is self-executing " 'if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given force

of law.' " *Id.* at 224, 658 A.2d at 928 (quoting *Davis v. Burke*, 179 U.S. 399, 403 (1900)). We further explained that "a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection." *Id.* In *Shields*, we held that Article 1, which states that "all men are born equally free and independent, and have certain natural, inherent, and unalienable rights," is not self-executing because it does not establish enforceable rights "but merely lists [them] to flesh out philosophical truisms." *Id.* at 224-25, 658 A.2d at 928.

¶ 47. On the other hand, we concluded that Article 13, which states that "people have a right to freedom of speech," is self-executing because it "unequivocally expresses more than general principles alone. It sets forth a single, specific right of the people to make themselves heard, a fundamental characteristic of democratic government." *Id.* at 226-27, 658 A.2d at 929-30. That, coupled with the absence of a legislative directive, supported our conclusion that Article 13 is self-executing. *Id.*

¶ 48. We reinforced this test for determining whether a provision is self-executing in *In re Town Highway No. 20*, 2012 VT 17, 191 Vt. 231, 45 A.3d 54, where we considered whether Article 7, which provides that the "government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community," is self-executing. *Id.* ¶ 30. There, we concluded that Article 7, like Article 13, "expresses a similarly fundamental right" and that right is "so certain and definite in character as to form rules for judicial decision." *Id.* ¶ 32 (quotation omitted).

¶ 49. ▮ We start with the recognition that *Shields* essentially decided the question before us. In holding that Article 1 is not self-executing, we interpreted it to state fundamental general principles, the terms of which are stated elsewhere in the Vermont Constitution. *Shields*, 163 Vt. at 224, 658 A.2d at 928. We identified one of those general principles as due process, as defined in Article 4. *Id.* at 226, 658 A.2d at 929. In essence, we held that the statement in Article 4 conferring due process rights is self-executing.

¶ 50. ▮ We recognize that we are dealing with a very broad concept, stated in language from an earlier century. As we have stressed in its application, Article 4 is about access to the judicial

branch to enforce the law. See *Holton v. Dep't of Emp't & Training*, 2005 VT 42, ¶ 27, 178 Vt. 147, 878 A.2d 1051. We cannot believe that the drafters of Article 4 intended that judicial access be denied by legislative inaction in creating an enforcement mechanism. Indeed, denial of access to the courts is a violation of the substantive requirements of the Article.

¶ 51. The principles of due process have been developed and applied in thousands of decisions from the state and federal courts. To say that the language from which these principles are drawn is too vague and general to enforce ignores the immense body of law. While that law did not exist when the constitutional provisions were written, we believe that this growth and development was intended by the drafters. In this way, we find Article 4 no more broad or general than Article 7, which we held as self-executing in *Town Highway No. 20*.

¶ 52. ▆ In support of our reasoning, we note that other state courts that have considered the question generally have found that the due process provisions of their state constitutions are enforceable by appropriate court action even without implementing legislation. See, e.g., *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 342-43 (Cal. 2002) (holding that due process clause is self-executing because "[i]t is clear that . . . even without any effectuating legislation, all branches of government are required to comply with its terms"); *In re Wretlind*, 32 N.W.2d 161, 167 (Minn. 1948) (stating that "prohibitive clauses of the constitution such as the due process clause are self-executing and require no legislation for their enforcement"); *Dorwart v. Caraway*, 2002 MT 240, ¶ 20, 58 P.3d 128 (recognizing that plaintiff can bring action under due process clause of state constitution). For example, in *Spackman v. Board of Education*, 2000 UT 87, 16 P.3d 533, the Utah Supreme Court held that the due process clause of its state constitution, which provides that "[n]o person shall be deprived of life, liberty or property, without due process of law," is self-executing because its terminology is mandatory and prohibitory. *Id.* ¶¶ 10-11. The court further explained that "although the right to due process is expressed in relatively general terms, it is both judicially definable and enforceable." *Id.* ¶ 12. The Maryland Court of Appeals reached the same result in *Widgeon v. Eastern Shore Hospital Center*, 479 A.2d 921 (Md. 1984), where it held that a state constitutional provision similar to our Article 4 — which states "[t]hat no man ought to be . . . deprived of his life, liberty

or property, but by the judgment of his peers, or by the Law of the land" — gives rise to a private right of action. *Id.* at 923 n.5, 930. We therefore hold that Chapter I, Article 4, of the Vermont Constitution is self-executing and that plaintiff properly invoked the Article in his complaint.

¶ 53. ▮▮ We stress, however, what we have not decided. We have not addressed the remedy plaintiff might receive if he proves a violation of the provision. Second, we have not addressed the merits of plaintiff's claim. We have characterized Article 4 "as the Vermont equivalent of the federal constitution's Due Process Clause," *Holton*, 2005 VT 42, ¶ 27, and have interpreted it "as requiring adequate access to judicial process." *Id.* But we have almost no precedents in which Article 4, rather than the Fourteenth Amendment to the United States Constitution, is the primary basis for decision and none in which the party invoking Article 4 is seeking relief within or because of an administrative process. To the extent that Article 4 may become the primary basis for relief in this case, the trial court will have to address how it meets the claims and facts before it.

¶ 54. We reverse the trial court's grant of summary judgment to the Town and hold that plaintiff is entitled to due process under Chapter I, Article 4 of the Vermont Constitution. We remand to the trial court to decide if the selectboard furnished plaintiff with adequate notice and hearing upon termination.

### IV. Promissory Estoppel

¶ 55. Finally, we address plaintiff's promissory estoppel claim. Plaintiff claims that the Town's attorney informed him that he could be terminated only "with cause" and essentially told him "that he would have to be guilty of gross abuse of municipal funds and official discretion before plaintiff could be fired." Plaintiff also claims that he relied on those statements to his detriment by accepting the town manager position and purchasing a home. The Town does not dispute that its attorney made these statements but argues that plaintiff did not otherwise establish the elements of promissory estoppel.[8] The Town argues that the attorney was not authorized to make promises on behalf of the selectboard, that

---

[8] The Town argues that the attorney involved was not the Town attorney but only a Town agent and that plaintiff did not show a material issue of fact with respect to reliance. In view of our disposition, we do not consider these issues.

the promises were nothing more than vague oral assurances, and that plaintiff was not justified in relying on those statements. The trial court agreed with the Town, concluding that plaintiff did not allege facts sufficient to demonstrate that he was entitled to rely on the attorney's statements or that his reliance was justifiable.[9] Although on different grounds, we agree with the trial court and affirm the court's grant of summary judgment to the Town on plaintiff's promissory estoppel claim.

¶ 56. ▉ Promissory estoppel requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance" and that "injustice can be avoided only by enforcement of the promise." *Woolaver v. State*, 2003 VT 71, ¶ 30, 175 Vt. 397, 833 A.2d 849 (quotation omitted). We have adopted the elements of promissory estoppel as set out in the Restatement (Second) of Contracts § 90(1) (1981). See *Foote v. Simmonds Precision Prods. Co.*, 158 Vt. 566, 573, 613 A.2d 1277, 1281 (1992). According to the Restatement, "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1) (1981). The promise must be more than "a mere expression of intention, hope, desire, or opinion, which shows no real commitment." *Escribano v. Greater Hartford Acad. of Arts*, 449 F. App'x 39, 43 (2d Cir. 2011) (quotation omitted). "[P]romissory estoppel may modify an at-will employment relationship and provide a remedy for wrongful discharge," *Foote*, 158 Vt. at 571, 613 A.2d at 1280, as long as the promise made by the employer was "of a specific and definite nature," *Woolaver*, 2003 VT 71, ¶ 30 (quotation omitted), and not merely a "vague assurance." *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 10, 819 A.2d 703, 710 (2002).

¶ 57. ▉ Plaintiff has not shown the presence of a promise sufficient to avoid summary judgment. See *Brower v. Holmes Transp., Inc.*, 140 Vt. 114, 117, 435 A.2d 952, 954 (1981) (stating that promissory estoppel cannot apply where there is no promise), *overruled on other grounds by Soucy v. Soucy Motors, Inc.*, 143

---

[9] Although the trial court defined the elements of promissory estoppel, it analyzed plaintiff's claim under the elements of equitable estoppel, a different doctrine. Plaintiff's claim is explicitly one of promissory estoppel, and we have not analyzed it under equitable estoppel.

Vt. 615, 471 A.2d 224 (1983). At best, the attorney was expressing his legal opinion. Under plaintiff's allegations, the attorney manifested no intention to act "in a specified way" except to provide his legal opinion to the selectboard, as he had done in the past. As the trial court found, the attorney never purported to speak on behalf of the board, and thus his statements could not be attributed to the board. The attorney never assured plaintiff that the selectboard held the same view regarding the statute. We cannot conclude that the expression of a legal opinion is a promise that the selectboard would act in a certain way.

¶ 58. We therefore affirm the trial court's grant of summary judgment to the Town and hold that plaintiff failed to satisfy the requirements of a promissory estoppel claim.

### V. Qualified Immunity

¶ 59. The Town raised one remedy issue: whether selectboard members are entitled to qualified immunity. The trial court ruled affirmatively. We address that issue, but first place it in its proper context.

¶ 60. Based on our decisions above, plaintiff is left on remand with three liability counts: wrongful discharge; violation of the Civil Rights Act, 42 U.S.C. § 1983; and violation of Article 4 of the Vermont Constitution. Plaintiff essentially sought three remedies: reinstatement to his position as town manager, compensatory damages, and punitive damages.[10] Each of the theories of liability is subject to a different body of law specifying the availability of remedies and could, for example, allow damages, or damages of a particular type, based on some liability theories and not on others. In general, the trial court did not reach issues of remedies because it found no liability on any theory.

¶ 61. The Town raised qualified immunity in the summary judgment motion, apparently viewing it as a complete defense to all liability theories against the individual selectboard members and a ground for denial of all remedies.[11] We say "apparently"

---

[10] The complaint is titled as one for "Declaratory Judgment, Injunctive Relief and Damages." The declaratory judgment apparently is that sought in Count I, which we have observed was essentially abandoned. See *supra*, ¶ 7 n.3. The injunctive relief is for reinstatement. The nature of the compensatory damages sought is not specified.

[11] The motion for summary judgment and supporting memorandum were filed before plaintiff moved to amend the complaint to join the Town of Saint Johnsbury

because the consequence of a determination that qualified immunity applies is not stated explicitly, but the trial court without explanation treated qualified immunity as an alternative ground for dismissing the termination-related counts of the complaint. While we accept that a finding of qualified immunity will restrict at least some of the remedies for some of the theories of liability, consistent with the context observation above we do not address which theories or remedies are restricted and how. We particularly do not rule that qualified immunity is a complete defense to all theories and all remedies.

¶ 62. The Town argues that its selectboard members are entitled to qualified immunity because they did not violate a clearly established right. The trial court granted summary judgment to the Town, concluding that, because § 1233 does not require cause for removal, plaintiff had no right to his employment as town manager. While we conclude that § 1233 *does* require cause for removal, we cannot conclude that the law was clearly established, and thus we hold that the selectboard members were entitled to qualified immunity.

¶ 63. ▌ Public officials are entitled to qualified immunity from 42 U.S.C. § 1983 liability when they are: "(1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11, 195 Vt. 308, 88 A.3d 1212. As we noted in *Baptie*, we are guided by the doctrine's purpose "to protect officials from exposure to personal tort liability that could (1) hamper their ability to effectively discharge their duties and (2) subject their discretionary determinations to review by a judicial system ill-suited to assess the full scope of factors involved in such determinations." *Id.* ¶ 12.

and drop the selectboard as a defendant. The motion addressed the liability of individual selectboard members. It never included the Town on this point.

As required under 24 V.S.A. § 901(a), an action against an "appointed or elected municipal officer" must be brought instead against the town. The Town here never raised this statute, although the original complaint appeared to have violated it. We read the statute as dictating which entity the plaintiff may sue but not restricting the theory of liability or the defenses available. Thus, plaintiff can raise against the Town the same theories of liability he can raise against the selectboard members, and the Town is entitled to defenses that can be raised by members of the selectboard, including qualified immunity. Cf. § 901a(b), (c).

¶ 64. ■ Plaintiff does not dispute the first and third prongs of the test, but argues that the selectboard members were not acting in good faith. Good faith "exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Id.* ¶ 11 (quotation omitted). We have adopted an objective standard of good faith. *Id.*

¶ 65. ■ A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Clearly established rights are not limited to federal laws but may also be found in state statutes. *Sabia v. Neville*, 165 Vt. 515, 522, 687 A.2d 469, 474 (1996). "There is no need for a case on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (quotation omitted). Thus, a mistake can be one of law or a mixed question of fact and law, *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and the doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011). It "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted).

¶ 66. ■ As we stated above, § 1233 on its face appears internally inconsistent and its terms ambiguous, and we have no case on point or other precedent that settles the issue. It certainly was not "beyond debate" when the selectboard acted. We therefore conclude that the law was not clearly established and the selectboard is entitled to qualified immunity. On this point, we affirm the trial court's grant of summary judgment.

*Reversed and remanded for further proceedings consistent with this opinion as to the claims of wrongful termination, violation of due process under 42 U.S.C. § 1983, and violation of Chapter I, Article 4 of the Vermont Constitution. Affirmed as to the promissory estoppel claim and the qualified immunity defense.*

¶ 67. **Reiber, C.J.,** dissenting. The majority's solution to the ambiguity inherent in 24 V.S.A. § 1233 — which provides that a town manager shall hold office "at the will of" the selectmen who "may remove him at any time for cause" — is to conclude that "at

the will of." does not mean what we think it means. In the majority's view, the phrase was not understood by its drafters "in the modern conventional sense" of an employment terminable at any time for any reason. *Ante*, ¶ 20. In support of this proposition, the majority claims that the at-will concept was not widely employed in Vermont law when the statute was enacted, and that "the Legislature may have viewed the language as having a different meaning from what it means today." *Ante*, ¶ 14. In contrast to the relative dearth of Vermont law employing the "at will" language, the majority cites a number of early Vermont cases and statutes using the alternative phrase "at the pleasure of."

¶ 68. The majority thus concludes that the "at will" language of the statute, enacted six years before *Mullaney*, was actually meant to convey something altogether different, to wit, that "it is the selectboard — *and no other authority* — that may remove the town manager and that the selectboard has the discretion to initiate termination." *Ante*, ¶ 20. Thus, the majority holds that the "for cause" language of the statute must control, and that — contrary to the conclusion of the trial court here — plaintiff was terminable only for cause.

¶ 69. With respect, the majority's assertion that the phrase "at the will of" is a "modern" construct that had an entirely different meaning in 1917 does not withstand historical scrutiny. As explained below, the "at will" language had precisely the same legal effect then as it does now — across the nation and in Vermont in particular. Thus, its accepted and conventional meaning must be harmonized with the rest of the statute — not read out of it — to serve a more plausible legislative purpose, one in which the "for cause" language does not *supersede* the at-will provision but appropriately *qualifies* it.

¶ 70. It is important to recognize, at the outset, that "at the will of" or "at will" employment was a legal phrase and construct widely used in the United States not only in the early decades of the twentieth century, when the statute at issue here was enacted, but in the century preceding it. Indeed, in the last half of the nineteenth and early years of the twentieth centuries, courts throughout the country employed the phrase precisely as we do today, to convey the idea of an employment terminable at any time for any reason as opposed to one terminable only for cause. Although far too numerous to cite in their entirety, these early decisions include *Gibbs v. City of Manchester*, 61 A. 128, 129 (N.H.

1905) (holding that, under state law, "the [police] commissioners are not authorized to remove police officers *at will*, but for good and sufficient *cause*, and after due hearing" (emphasis added)); *State ex rel. Fitzgerald v. Mayor of New Brunswick*, 1 A. 496, 501 (N.J. 1885) (noting that the "power of removal" of police officers "may exist in some cities *at the will of* some municipal officer or body of officers" while in others the removal is only *"for cause"* (emphasis added)); *People ex rel. Wheeler v. Cooper*, 57 How. Pr. 416, ___ (N.Y. Sup. Ct. 1879) (holding that mayor's "power . . . to remove is *for cause*, after an opportunity to be heard," and observing that not allowing a hearing would render the "safeguard . . . a hollow device and a sham; because a removal could actually be made *at the will of* the removing power" (emphasis added)); *Smith v. Bryan*, 40 S.E. 652, 653-54 (Va. 1902) (observing that "the absolute power of removal" is "a tenure *at will*" as opposed to one *"for cause"* (emphasis added)).[12]

¶ 71. Reflecting the nearly universal understanding of the at-will concept, late nineteenth- and early-twentieth-century commentators on the law of municipal corporations routinely utilized the phrase in its "modern" sense in characterizing the tenure of municipal officers. See, e.g., 2 J. Dillon, Commentaries on the Law of Municipal Corporations § 473, at 791 (5th ed. 1911) ("With respect to the tenure or duration of a public employment, the general rule is that where the power of appointment is conferred in general terms . . . *the power of removal*, in the discretion and *at the will of* the appointing power and without notice or a hearing, *is implied* . . . ." (second emphasis added)); 2 E. McQuillan, Municipal Corporations § 558, at 1229 (1911) ("Unless the law otherwise provides, if the officer is appointed . . . and no definite term is prescribed, he holds *at the will* or pleasure of his superior or the appointing . . . authority . . . ." (emphasis added)).

¶ 72. Thus, as one more recent court — recounting the history of the at-will employment concept — has concluded: "By the arrival of the twentieth century, the at-will doctrine was well-established throughout the United States and served to reinforce turn-of-the-century ideas concerning *laissez-faire* economics and

---

[12] That the at-will employment language and concept have even earlier roots may be seen in such cases as *Avery v. Inhabitants of Tyringham*, 3 Mass. 160 (1807), where the court held, as to the local minister, that if "his office be *at will*" the parish "can remove him at their pleasure" rather than "for good cause." *Id.* at 178 (emphasis added).

freedom to contract." *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1041 (Utah 1989); see also *Bernard v. IMI Sys., Inc.*, 618 A.2d 338, 343 (N.J. 1993) (noting that, by 1913, most jurisdictions had explicitly adopted at-will employment rule).

¶ 73. In light of the foregoing, it simply strains credibility to maintain that an employment characterized as "at the will of" the appointing power lacked the same legal meaning and effect in early-twentieth-century Vermont that it had throughout the rest of the United States. We need not, however, merely surmise how the phrase was understood here from its broad acceptance elsewhere. For it was certainly in use in Vermont prior to the enactment of the town manager statute in 1917, the majority's claim to the contrary notwithstanding.

¶ 74. In *Rutter v. Burke*, 89 Vt. 14, 93 A. 842 (1915), this Court considered the Burlington city council's authority to remove certain water commissioners under a charter provision empowering the council to remove its appointees "for such causes of incapacity, negligence or bad conduct as to it shall seem sufficient." *Id.* at 17, 93 A. at 844. The city claimed that the charter gave the council unfettered authority to remove appointees "in its discretion, or at its pleasure." *Id.* at 26, 93 A. at 848. We rejected the claim, however, relying on the plain language of the charter, which clearly limited the removal power to the enumerated causes, as well as the "well established rule that *an authority to remove for cause excludes the power to remove at will.*" *Id.* (emphasis added). *Rutter* relied, in turn, on a number of out-of-state decisions in support of this "well established" proposition; all were decided decades earlier, and all employed the familiar "at will" terminology. *Id.* at 26-27, 93 A. at 848; see *Miles v. Stevenson*, 30 A. 646, 648 (Md. 1894) (contrasting statute at issue, which expressly required cause for removal, from others where "there is no limit fixed to the term of the office and the appointee holds merely *at the will of* the appointing power" (emphasis added)); *Speed v. Common Council*, 57 N.W. 406, 410 (Mich. 1894) (noting that where provision provides that officers may be "removed for cause" it "excludes the power to remove *at will*" (emphasis added)); *State ex rel. Gallagher v. Brown*, 57 Mo. App. 199, 1894 WL 2191, at *2 (1894) (noting that law generally provides for two ways of removing a public officer, "for cause" and "without cause, *at will*" (emphasis added)).

¶ 75. Thus, plaintiff's argument, and the majority's conclusion, that "at the will of" as used in § 1233 did not mean the same

thing in Vermont in 1917 as it does today is entirely unpersuasive. Equally futile is plaintiff's broader historical argument that, as part of the general "progressive" reform movement of the early twentieth century, the town manager form of government was designed to "insulate[ ]" the town manager from the shifting "political winds" that might effect a change in local selectboards. This goal of progressive municipal reform, plaintiff argues, lends general support to the proposition that, in enacting § 1233, the General Assembly intended to require good cause for removal rather than allow removal at the whim of the current selectboard.

¶ 76. Apart from the absence of any evidence showing that this was, in fact, the driving ideal behind the statute, however, the argument — taken on its own terms — is overly simplistic and unreliable. Historians have long noted the underlying social, economic, and especially political complexities that animated "progressivism" as a movement. See, e.g., D. Rogers, *In Search of Progressivism*, 10 Revs. in Am. Hist. 113, 114 (1982) (noting "the emergence of a pluralistic reading of progressive politics, in which the fundamental fact of the era is not reform in any traditional sense of the term, but the explosion of scores of aggressive, politically active pressure groups into the space left by the recession of traditional political loyalties"). Nowhere was this more true than in the area of municipal reform, where scholars have shown that innovations such as the commission or town manager form of city government were pushed through by economic and social elites to wrest power from local ward bosses and centralize control in professional "experts" and upper-class businessmen. See, e.g., S. Hays, *The Politics of Reform in Municipal Government in the Progressive Era*, 55 Pac. N.W. Q. 157, 159, 161-62, 167 (1964) (noting that business community was "overwhelming force behind both commission and city-manager movements," that their objection to status quo was not to "corruption per se" but a system that allowed lower-class and immigrant groups to dominate local politics, and that they "hoped . . . reform would enable them to increase their political power" and serve "as vehicles whereby business and professional leaders moved directly into the inner circles of government"). Confronted with growing numbers of enfranchised, lower-class urban immigrants, the goal of progressive reformers was thus not to remove political influence from municipal government, but to keep it in the right hands. See *id.* at 162 (concluding that municipal reform movements "constituted

an attempt by upper-class, advanced professional and large business groups to take formal political power from the previously dominant lower- and middle-class elements so that they might advance their own conceptions of desirable public policy").

¶ 77. It is hardly surprising, therefore, to find statutes authorizing cities with a town manager form of government to remove the manager at will, or to find courts upholding such provisions as consistent with that form of governance. See, e.g., *Curry v. City of Cambridge*, 217 N.E.2d 740, 742 (Mass. 1966) (observing that "powers and duties of the city manager are so closely coordinated with those of the city council in the general management of the city's affairs that the Legislature manifestly could not have intended that its incumbent should be allowed to remain in office even for a very short period of time against the city council's wishes"); Note, *City Government*, 38 B.U. L. Rev. 419, 456, 463-64 (1958) (reviewing history of "city manager form of government" in New England, discussing its statutory bases, and noting that town managers are generally removable at pleasure of city council under statutory provisions in Massachusetts, New Hampshire, and Connecticut).

¶ 78. Thus, there is no historical basis to conclude that the legislative purpose in enacting § 1233 was to insulate the town manager from local politics by ensuring that his or her removal was not at the will of the selectboard but solely for cause.

¶ 79. We are thus squarely confronted with the need to reconcile two seemingly contradictory concepts — removal "for cause" and "at will" — in one statute. We are not, however, entirely without guidance in this regard. A series of decisions construing equally venerable Massachusetts laws regulating the removal of municipal appointees provide a useful starting point. In *O'Dowd v. City of Boston*, 21 N.E. 949 (Mass. 1889), the high court of Massachusetts was confronted with a statute authorizing a city board to remove ferry workers "for such cause as they may deem sufficient, and shall assign in their order for removal." *Id.* at 949 (quotation omitted). The plaintiff claimed that the statute required that removal be for cause, while the city maintained that dismissal was purely at the pleasure of the board.

¶ 80. The Massachusetts court noted the potential ambiguity in the statute that appeared to vest broad removal discretion in the board and require removal for "cause." *Id.* at 950. It resolved the issue by holding "[t]he intention of the statute . . . to be to

*qualify* a removal at pleasure by requiring a *record* to be made of the cause." *Id.* (emphasis added). This construction, the court observed, ensured both "the vigor and efficiency of [public] administration" served by the at-will doctrine, while simultaneously discouraging — through the requirement of public disclosure — removals against public policy, i.e., "for a cause for which it could not lawfully be made." *Id.* Armed with at least a record of the reason for removal, the employee might ultimately appeal to the "court" of public opinion. *Id.*

¶ 81. The Massachusetts court reached the same result in applying a similar municipal provision in *Ray v. Mayor of Everett*, 103 N.E.2d 269 (Mass. 1952). There, a city charter provided that officers appointed by the mayor "may be removed by the mayor for such cause as he shall deem sufficient and shall assign in his order of removal." *Id.* at 271. The court held that the mayor had complied with the statute by stating the "cause" for removal in general terms, and was not required to bring specific charges or afford the employee a hearing, leaving it instead to the "conscience and sound judgment" of others, rather than the law, as to whether the cause was sound. *Id.* at 272.

¶ 82. In *Fabrizio v. City of Quincy*, 404 N.E.2d 675 (Mass. App. Ct. 1980), the same issue was revisited in a more modern statute to the same effect, providing that a mayor may remove a department head "by filing a written statement with the city clerk setting forth in detail the specific reasons therefor." *Id.* at 676 (quotation omitted). The court held that the mayor had complied with the statute and that, contrary to the plaintiff's claim, he was not afforded a "property" interest under the statute entitling him to a hearing and other due process protections. *Id.* at 677.

¶ 83. Although these provisions obviously differ from § 1233, they nevertheless suggest a useful general approach to reconciling the latter's seemingly conflicting terms by qualifying the town manager's "at-will" tenure in office with a requirement that the selectboard state the "cause" for removal. As suggested in *O'Dowd*, this approach preserves the efficiency of the at-will doctrine in municipal employment while also providing at least a basis for the town manager — and ultimately the public — to judge the wisdom and merits of the decision. Thus understood, plaintiff here and other town managers enjoy no "protectable property interest" in their employment entitling them to any process other than a clear statement from the selectboard as to

the cause of their removal. *Brennan v. Town of Colchester*, 169 Vt. 175, 179-80, 730 A.2d 601, 605 (1999).

¶ 84. Here, the record surrounding the selectboard's removal decision and its express statement that plaintiff's termination was for actions that were "directly against the will of the board" and further "misrepresented" by plaintiff to the board, was sufficient to state the "cause" for his removal and thereby satisfy the statute. Accordingly, I would affirm the summary judgment of the trial court in favor of the Town.

¶ 85. Although I find the majority's reasoning to be unpersuasive, this is clearly a challenging case. An ambiguous law, nearly a century after its enactment, presents a unique problem for judicial construction. Contrary to the conclusion of the majority, however, the difficulty is not understanding the statute's conflicting terms; it is understanding how they relate. While we cannot hope to know precisely how the drafters would have answered this question, we can — and must — at least attempt to harmonize the language they actually used. Qualifying the Town's otherwise absolute removal authority under the "at will" provision of the statute by requiring that it set forth the "cause" for removal offers, in my view, a workable resolution. While it may or may not precisely mirror the drafters' intent, it is at least more faithful to their language. Accordingly, I respectfully dissent.

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.